THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ALFRED ROMO, Defendant-Appellant.

First District (5th Division)   No. 79-624

Opinion filed June 13, 1980.

John Panici, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Jeremiah W. Lynch, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was charged by information with robbery. (Ill. Rev. Stat. 1975, ch. 38, par. 18—1.) After a jury trial, he was found guilty and sentenced to a term of probation for four years upon condition that he serve two of those years on a work release program. On appeal, he contends that: (1) the trial court erred in not quashing the information because he was not given a proper preliminary hearing; (2) the trial court erred in not suppressing evidence seized on his arrest because there was no probable cause to make the arrest; (3) the evidence was insufficient to prove him guilty of robbery beyond a reasonable doubt; and (4) reversible trial errors occurred during trial. Although we find it necessary to reduce defendant's conviction from robbery to theft (par. 16—1), we affirm the conviction but remand for sentencing on the reduced conviction of theft.

Juan Figueroa, the victim, and Mark Hofer, the arresting officer, testified in the State's case-in-chief. Figueroa, who testified through an interpreter because he did not speak any English and understood only "some" English, stated that from about 10 p.m. on September 10, 1977, to 3 a.m. on September 11, he was at the home of a friend, Angel Ortega. While there, he played bingo, but not for money, and drank soda pop, even though others drank beer. Sometime around 3 a.m. he left Ortega's home and drove to his home which was in the vicinity of Cortland and Wolcott. He arrived there at about 3:30 a.m. While parking his car on Wolcott, a red Ford Maverick, with three occupants, pulled up and parked near him. As Figueroa got out of his car, so too did the Maverick's driver, who Figueroa identified as defendant. On direct examination, Figueroa testified that one of the other occupants of the Maverick also got out and walked away but that he did not know what the other occupant did. On cross-examination, he testified that both of them got out of the car at the same time as defendant. In either event, only defendant approached him and started talking to him. Figueroa stated that even though defendant spoke English, "as scared as I was, anyone could understand him." Defendant told Figueroa that he was a detective and showed him some handcuffs and "something that looked like a gold star" in a black wallet. He then asked to see Figueroa's driver's license. When Figueroa took out his wallet to show defendant his license, defendant "grabbed" the wallet and before returning it to him, removed all the money from it. Figueroa stated that he knew that defendant had taken $170 from his wallet because that was the amount which remained from his pay from work. He could not, however, specifically remember what the denominations of all the bills were, but he said that they were twenties, tens, fives, and ones. After Figueroa received his wallet, he asked defendant to at least give him some money to buy some milk and

bread for his wife and children. Defendant then gave him $10. Before defendant left, he pushed Figueroa over by his car, kicked him in the left calf, and told him that if he told anybody about what had happened, he would kill him. Although not clear from the record, during this specific time frame, Figueroa screamed, causing his wife to come from their home. Defendant then got into his car and drove off. While he was leaving, Figueroa managed to see the license plate number UP 2595 on the car.

Figueroa went to Angel Ortega's home to call the police. He could not use his own telephone because it had been disconnected. Mrs. Ortega, who spoke English, called the police and told them what Figueroa had told her. About 25 minutes after the call, the police arrived at the Ortega home. A woman, assumedly Mrs. Ortega, told them what Figueroa had told her about the incident. Figueroa said that he had told her that a man, claiming he was a detective, had taken his money and had driven away in a red Maverick. He also told her what the license number of the car was. The police then apparently left the Ortega home for awhile. About 30 minutes later, they returned to the home in order to drive Figueroa to the police station. After they arrived at the station, Figueroa remained waiting in a hallway of the station. Some time later, he went looking for a washroom. While doing so, he came to a room where he saw defendant sitting on a bench with four other people. He then stated in Spanish that "that's the man." A friend of his helped translate that statement into English for the police.

Officer Hofer testified that at about 4 a.m., while driving in an unmarked police car in the vicinity of Wood and Armitage, he received a radio message that three males, riding in a 1973 red Ford Maverick, had just committed a robbery. After hearing this message, he saw a car fitting the description. Before doing anything, he called the radio dispatcher to ask if there was any additional information on the car. He was told that the license plate number on the car was UP 2595, which was the same number as was on the car which Hofer had seen. He then stopped the car, which did not try to evade him, at approximately 1616 West Beach Street. He ordered the three occupants out of the car and searched them for weapons. As he was searching them, defendant said: "Why are you searching me? I'm a police officer." Then, in response to Hofer's request that he prove it, defendant showed him his wallet with a gold security guard's badge and his photograph identification card. Hofer also found a set of handcuffs, which contained an engraved serial number and defendant's engraved name, on him. Defendant told him that he was a security guard. Subsequently, defendant and his two companions, who gave their names as Francisco Romo (hereafter Francisco) and Santos Lozada, were taken to the police station.

While defendant and his two companions were at the police station, Hofer found the sum of $161 on them. Of this amount, $10 came from defendant, $56 came from Francisco, and $95 came from Lozada. Although Hofer could not remember the denominations of the bills taken from the three of them, he read from his police reports which indicated that there were 5 twenties, 5 tens, 1 five, and 6 ones. Both Francisco and Lozada claimed that the money found on them belonged to them. About an hour later, Hofer saw Figueroa in the station. He saw Figueroa pointing at defendant while he was saying something in Spanish. He also saw a woman with him at the time. Sometime later, Francisco and Lozada were released from the station because Figueroa could not identify them.

Defendant, Santos Lozada, and several reputation witnesses testified for the defense. Defendant stated that on September 10, 1977, he had worked as a security guard at a store. He said that the store was the only place where he held himself out to be a police officer. After work, he drove home, picked up his wife and children, and then went bowling with them. He was in such a hurry at that time that he did not go into his home and remove his security guard badge or handcuffs from his back pocket. After bowling, he returned his family to their home and, later that evening, went to Francisco's house where he watched television with a number of other people. While watching, he consumed about 1½ cans of beer. At about 1 or 1:30 a.m., he, Lozada, and Francisco left Francisco's home and went to a tavern at Honore and Wabansia. While Francisco remained in the car, defendant and Lozado went into the tavern to buy a six-pack of beer. While defendant was inside, he played pool with the owner of the tavern and drank half of a mixed drink. At about 2:35 a.m., he left the tavern with Lozada and then drove to a friend's home in the vicinity of Cortland and Wolcott. The trip took about 20 minutes.

As defendant was driving in the area, another car made a U-turn in front of him, nearly causing an accident. After the driver of the other car, Figueroa, parked his car, defendant got out to talk to him. Francisco and Lozada also got out of the car, but went about 45 feet away to relieve themselves. Defendant asked Figueroa why he had made the U-turn. When Figueroa started swearing at him in Spanish, he told him to calm down. Figueroa then placed his hands on defendant who then pushed him away. Defendant said that during the encounter Figueroa was staggering and that he had smelled his breath and concluded that he had been drinking. At some point during this encounter, defendant's badge fell out of his pocket as he hitched his pants. Defendant said that Figueroa saw the badge. Towards the end of the encounter, a woman stuck her head out a window in one of the buildings and started screaming at defendant. He then said that he did not want any trouble, and left.

About 25 minutes later, defendant arrived at 1616 Beach. When he

got out of the car, a policeman pointed a gun in his face, searched him, and took his two wallets. An officer then handcuffed defendant with his own handcuffs and took him to the police station. There, he was forced to empty the money out of his pockets. He only had $10. He said that he had not given any money to either Francisco or Lozada on that evening and that he had never taken any money from Figueroa. While he was at the station, he did not see Figueroa.

Santos Lozada corroborated much of what defendant had testified to regarding the events prior to defendant's encounter with Figueroa. After defendant and Figueroa got out of their cars, Lozada and Francisco went to relieve themselves and thus, could not see or hear the substance of the encounter. Later, when he was taken to the police station, he emptied out his pocket. After he had said that he had $95, a police officer apparently expressed surprise because that amount added to the amounts possessed by defendant and Francisco was close to the amount of money supposedly taken from Figueroa. Lozada testified that the money was his and was the remnant of the pay which he had received from work on the previous day. While in the station, he was present when Figueroa appeared at the doorway to the room in which he and defendant were seated. Figueroa pointed at defendant but, before he could come into the room, he was chased away by one of the officers. Eventually, Lozada was released without being charged with any crime. Nevertheless, the $95 were never returned to him.

Five witnesses, including defendant's wife, sister, mother, brother-in-law, and wife's uncle, all testified to defendant's reputation in the community. They all testified that he had a good reputation for honesty.

Officer Patrick Garrity testified in rebuttal for the State that at about 3:50 a.m. on September 11 he saw Figueroa at the scene of the crime. He said that he was anywhere from 25 feet to right next to Figueroa when he saw him. He spoke with him and verified what he understood Figueroa to have said through an interpreter. He said that during this time he noticed that Figueroa's breath and walk were normal. Later, he filled out a police report on which he indicated that Figueroa was sober.

OPINION

I

Defendant contends that he was not proven guilty of robbery beyond a reasonable doubt.

A person commits the crime of robbery "when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1975, ch. 38, par. 18—1.) Among the elements which must be established to prove robbery, the State must establish beyond a reasonable doubt that the force alleged

was "of such a character as to temporarily suspend the [victm's] power to exercise his will." (*People v. Stewart* (1977), 54 Ill. App. 3d 76, 80, 369 N.E.2d 131, 133.) The State also must establish that the force preceded or was contemporaneous with the taking of the property. *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013.

■■ We find that the evidence presented by the State in this case was insufficient to support a conviction for robbery because of the lack of sufficient evidence of force. The evidence presented did not demonstrate the use of force or the threat of the imminent use of force sufficient to temporarily suspend Figueroa's power to exercise his will. Defendant simply stated that he was a police officer, showed his badge and handcuffs, asked for Figueroa's wallet, grabbed the wallet, and then took the money. Even though Figueroa claimed that he was "scared" during this series of events, we do not believe that his subjective feeling is decisive here. What is decisive is the absence of any struggle or verbal threats by defendant during the events leading up to or at the time of the taking. (See *People v. Williams* (1976), 42 Ill. App. 3d 134, 355 N.E.2d 597.) The pushing, kicking, and threatening which occurred just before defendant left the scene of the crime cannot be considered as evidence of force used in the taking because they did not immediately follow the taking or constitute part of the *res gestae* of the robbery. See *People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685; *People v. Chambliss* (1966), 69 Ill. App. 2d 459, 217 N.E.2d 422.

■■ Contrary to the State's claim, the "grabbing" of the wallet from Figueroa's hands was not sufficient evidence to support the force element of the crime of robbery. In *People v. Patton* (1979), 76 Ill. 2d 45, 389 N.E.2d 1174, the Illinois Supreme Court rejected a similar claim in a "purse snatching" case, and we believe that the reasoning of that case is applicable to the present facts. There, as here, the property was taken from the victim before the victim knew what was happening and before the victim could put up a struggle. Also, contrary to the State's claim, defendant's portrayal of himself as a detective to get Figueroa to produce his wallet, either alone or together with the subsequent "grabbing," was not sufficient evidence to support the force element of robbery. The showing of a mere pretense of legal authority without some additional showing of force, either actual or constructive, is insufficient to support the force element of robbery. (*People v. Bodkin* (1922), 304 Ill. 124, 136 N.E. 494; *People v. Denman* (1966), 69 Ill. App. 2d 306, 217 N.E.2d 457.) As already indicated, there were no other facts or circumstances in this case indicating force, either actual or constructive.

■■ There was, however, sufficient evidence in this case to support a conviction for the crime of theft. Theft may be established by a sufficient showing that one has knowingly obtained or exerted unauthorized control

over the property of another with the intent to permanently deprive that person of the use or benefit of the property. (Ill. Rev. Stat. 1975, ch. 38, par. 16—1.) The evidence in this case sufficiently established that defendant knowingly took $160 from Figueroa with the intent to permanently deprive him of the money. Figueroa's testimony, including his definite stationhouse and trial identifications of defendant, sufficiently established these details to prove defendant guilty beyond a reasonable doubt. (See *People v. Abney* (1978), 65 Ill. App. 3d 167, 382 N.E.2d 407.) Other evidence, including the money recovered, further supported defendant's conviction. The testimony of the numerous reputation witnesses on defendant's behalf does not alter our conclusion on this issue. Though we are not unaware of the value of reputation evidence in certain cases, including those in which the identification is not as definite as it was in this case (see *People v. Gold* (1935), 361 Ill. 23, 196 N.E. 729; *People v. Lonzo* (1974), 20 Ill. App. 3d 721, 315 N.E.2d 256), we do not find defendant's reputation testimony to be so strong or the State's case to be so weak as to raise a reasonable doubt of defendant's guilt of theft.

Having decided that the evidence was insufficient to support a conviction of robbery but sufficient to support a conviction of theft, we must next address ourselves to the problem of whether we can reduce the conviction from robbery to theft when, as here, theft has not been charged in the information.

The information in this case charged that defendant committed robbery "in that he, by use of force and by threatening Juan Figueroa with the imminent use of force took an amount of United States currency from the person and presence of Juan Figueroa." It did not, however, charge that defendant specifically intended to permanently deprive Figueroa of his money. Although, as we have already found, there was sufficient evidence to establish such an intent, that finding does not end our discussion of the matter since due process requires that an information adequately inform defendant of the charge against him so that he may prepare a defense and be protected against double jeopardy. *People v. Tyler* (1977), 45 Ill. App. 3d 111, 359 N.E.2d 240.

In *People v. Yanders* (1973), 32 Ill. App. 3d 599, 335 N.E.2d 801, the reviewing court reversed the trial court's reduction of a robbery conviction to a theft conviction because the indictment, which was worded essentially the same as the information in this case, did not charge defendant with the specific intent to permanently deprive his victim of the property taken. Although the court there found sufficient evidence to convict defendant of theft, it stated:

> "Nevertheless, we cannot see how the offense of theft, an element of which is the actor's specific intent to permanently deprive the victim of property, can logically be held to be included in the

offense of robbery where no such specific intent is required." (32 Ill. App. 3d 599, 602-03, 335 N.E.2d 801, 804.)

In other cases, however, convictions of robbery have been reduced to theft even though there was no evidence that defendants had been charged with the specific intent to permanently deprive a victim of the property taken. (*People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013; *People v. Williams* (1976), 42 Ill. App. 3d 134, 355 N.E.2d 597; *People v. Tolentino* (1966), 68 Ill. App. 2d 480, 216 N.E.2d 191.) Although these cases proceed from the faulty assumption that the only distinction between robbery and theft is that robbery requires the use or threat of the imminent use of force, we believe that the results reached in those cases were proper in light of the demands of due process.

■ As already noted, due process requires that an information adequately inform a defendant of the crime he is charged with so that he can prepare a defense and be protected against double jeopardy. We believe that the information in this case, even though it did not charge defendant with the specific intent to permanently deprive Figueroa of his property, met these demands. We believe that it sufficiently apprised defendant of the crime he was charged with so that he might prepare a defense because the intent element is logically presumed in a charge of robbery. As was noted in *People v. Beck* (1976), 42 Ill. App. 3d 923, 924, 356 N.E.2d 848, 850, "[i]t would be contrary to experience and reason to conclude a stranger would forcefully take money from another stranger without fully intending to permanently deprive the wronged party of the money." Since the intent element is logically presumed in the charge of robbery, defendant had sufficient information with which to present his defense. The information also adequately apprised defendant of the crime charged so that he would not be subject to double jeopardy. Double jeopardy would result if defendant were convicted of an offense and then retried for the same offense. (See *People v. Gray* (1977), 69 Ill. 2d 44, 370 N.E.2d 797.) Defendant's conviction for robbery in this case, even if we were to reduce it to theft, would bar a subsequent prosecution for robbery. If we were to reduce his conviction to theft, the theft conviction would be a subsequent prosecution for the same offense.

Since we find that the demands of due process were met in this case, we reduce defendant's conviction of robbery to theft. In doing so we must also remand this case to the trial court for sentencing on the reduced conviction for theft.

## II

We next briefly address ourselves to other issues raised by defendant in this appeal.

Defendant contends that the information should have been quashed

because he was not given ample opportunity to cross-examine Figueroa who was the only witness to testify at the hearing. Specifically, he argues that the hearing was a sham because almost every question he asked was objected to and each objection was sustained by the trial court. We disagree.

■■ Whether a defendant has been given an ample opportunity to cross-examine at a preliminary hearing must be determined from the circumstances in each case. (*People v. Horton* (1976), 65 Ill. 2d 413, 358 N.E.2d 1121.) Generally, cross-examination is subject to the rule that it may not extend "beyond the scope of the direct examintion and such further interrogation as is directed to show interest, bias, prejudice or motive of the witness to the extent that these factors are relevant to the question of probable cause." (*People v. Horton* (1976), 65 Ill. 2d 413, 416-17, 358 N.E.2d 1121, 1123.) Upon careful review of the questions upon which objections were sustained in this case, we find that they were properly sustained as being either irrelevant or beyond the scope of cross-examination. Furthermore, we note that although defendant claims that he was not given an ample opportunity to question Figueroa, his cross-examination was not abruptly terminated by the trial court but was terminated only after he informed the court that he had no further questions.

Defendant contends that the trial court should have granted his motion to suppress the handcuffs and detective's badge which were seized when he was arrested because the police did not have probable cause to arrest him.

According to testimony received at the hearing on the motion to suppress, immediately prior to defendant's arrest, Officer Hofer received a radio call informing him of a car wanted in a strong arm robbery. Hofer stated that although he could not recall if the person who made the call identified himself, the calls were "usually made and always made" by policemen or employees of the Chicago Police Department. He said that this particular call originated in the 14th District. This particular call identified the wanted car as a 1973 red Ford Maverick with license plate No. UP 2595. After receiving the call, Hofer saw a car fitting that description and called to confirm that the car was still wanted. After receiving a confirmation, Hofer stopped the vehicle and proceeded to arrest the three individuals who were in the car, including defendant who had been driving.

◈ 6 The evidence demonstrates that Officer Hofer had probable cause to arrest defendant. The standard we use in making our determination is the much-recognized standard which was recently restated in *People v. Johnson* (1979), 71 Ill. App. 3d 143, 148, 388 N.E.2d 1320, 1324, as being:

"The test of probable cause is whether a reasonable and prudent

man in possession of the knowledge of the arresting officer would believe that the person to be arrested is guilty of the crime; that it is something less than the evidence required for conviction; and that it is based upon the factual and practical considerations of everyday life upon which reasonable men, rather than legal technicians, act."

The evidence that showed that Officer Hofer knew the year, the color, the model, the make, and the license plate number of the automobile involved in the strong arm robbery and confirmed this information prior to making the arrest was sufficient to meet this test for probable cause. (*People v. Turner* (1975), 32 Ill. App. 3d 221, 336 N.E.2d 49.) Therefore, since the arrest was made on probable cause, the trial court properly denied defendant's motion to suppress.

Defendant contends that the trial court erred in not granting his motion for a mistrial after one of the State's witnesses testified to a statement allegedly made by defendant despite the fact that the State had not previously disclosed this statement to defendant.

At trial, Officer Hofer testified that as he was searching defendant, defendant said: "Why are you searching me? I'm a police officer." Defendant subsequently moved for a mistrial because the State did not furnish him with this statement as he had requested in a pretrial written discovery motion or as he had orally requested on the morning of the first day of trial. The trial court denied the motion, stating:

"I don't regard the defendant's statement to the police officer at the time of the initial stop as in the category of discovery purposes. It is a preliminary question by the police officer at the time of the stop, and I know of no law that considers that phrase of police questioning as a confession type statement or admission."

Supreme Court Rule 412(a)(ii) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a)(ii)) provides:

"Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

\* \* \*

(ii) any written or recorded statements and the substance of any oral statements made by the accused \* \* \*."

Thus, according to this rule, upon proper request, the defense is entitled to be furnished with all statements made by the accused, even if the statements cannot be appropriately characterized as an admission or a confession. A failure to make such a disclosure will in certain circumstances warrant a new trial (*People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117), while in other circumstances it will be deemed

harmless error. *People v. DeBord* (1978), 61 Ill. App. 3d 239, 377 N.E.2d 1308.

■■ We find that the State's failure to furnish defendant with his statement was harmless error because the statement, even though supporting Figueroa's testimony that defendant portrayed himself as a police officer, did not directly contradict Figueroa's testimony that defendant took his money. This alone makes this case different than *People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117, a case cited by defendant. In *Szabo*, the reviewing court ordered a new trial, when defendant's statement which amounted to an admission or confession of one of the crimes charged, was not furnished to defendant upon proper request. Furthermore, the support which the statement in the present case provided for Figueroa's testimony was not the only support for such testimony since defendant's statement that he was a security guard and the recovery of handcuffs and the badge upon defendant's arrest lent further credence to Figueroa's testimony. In light of these circumstances, and absent any other showing of prejudice, we will not interfere with the trial court's discretion in denying the motion for a mistrial. *People v. DeBord* (1978), 61 Ill. App. 3d 239, 377 N.E.2d 1308.

■■■ Defendant contends that the trial court committed reversible error by admitting hearsay evidence.

Defendant cites numerous instances of statements which he considers to be hearsay. Some of the alleged hearsay statements were made by Figueroa who took the witness stand and was cross-examined by the defense. Because Figueroa, the out-of-court asserter, was exposed to cross-examination on these statements by the defense, his statements cannot be considered hearsay. (*People v. Townsend* (1977), 47 Ill. App. 3d 789, 365 N.E.2d 110; *People v. Robinson* (1977), 47 Ill. App. 3d 48, 361 N.E.2d 759.) Another alleged hearsay statement was admitted into evidence when Officer Hofer testified concerning the content of the radio call message which he received. This testimony, however, did not contain a hearsay statement because it merely explained why Officer Hofer arrested defendant. (*People v. Houston* (1974), 21 Ill. App. 3d 209, 315 N.E.2d 192.) Furthermore, the information contained in the radio call was similar in most respects to the information testified to by Figueroa and he, as we have already stated, was then subject to cross-examination by the defense. All other claims of hearsay by defendant are without merit and further comment is unnecessary.

Defendant contends that he was denied a fair trial because of numerous improper comments made by the State during closing argument. In particular, he claims that the following comments were improper:

(1) the assistant State's Attorney's suggestion to the jury that they

confirm or discredit defendant's testimony that his wallet fell out of his pocket, opened up, and revealed the badge by conducting a similar test of their own while they were in the jury room;

(2) repeated references to defendant's driving on the night of the incident as "cruising"; and

(3) a statement that Figueroa told the police about the handcuffs. Although we find that these comments were improper, they did not deny defendant a fair trial.

■■ The suggestion that the jury perform tests to either confirm or discredit defendant's testimony was improper because it was never established that the ground conditions at the scene of the crime were the same as the ground conditions in the jury room. To invite jurors to judge the credibility of a witness' testimony on the basis of the results of a test which is conducted under conditions which have not been established by evidence is similar to asking a jury to judge the credibility of a witness on the basis of facts not in evidence. The repeated references to "cruising" was improper because it was not based on the evidence. Although there was evidence that defendant and his companions took relatively long periods of time to travel short distances late at night, we believe that an inference that they were cruising, with all the connotations associated with the word, was improper. The comment with respect to the handcuffs was also improper because there was no evidence to support such a comment. The record merely indicates that Figueroa told the police that his assailant claimed he was a detective. Under certain circumstances, such comments would warrant a new trial. (See *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164.) Nevertheless, under the circumstances of this case where the evidence of defendant's guilt of theft was strong and the comments were not directed toward the central fact in this case, the taking of the money, the errors were harmless.

We have carefully considered all other issues raised by defendant and find them to be without merit.

Judgment of conviction affirmed; remanded for resentencing.

LORENZ and MEJDA, JJ., concur.